**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **OLEN WELLS, JR.,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **5:04-CV-83(WDO)** |
| | : | |
| **CAL-MAINE FOODS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

## ORDER

Plaintiff sued Defendant Cal-Maine Foods alleging fraud, negligent representation and breach of contract in relation to the termination of Plaintiff's services as an egg supplier for Cal-Maine. Cal-Maine counterclaimed requesting costs and attorney's fees. Cal-Maine filed a motion for summary judgment on all of Plaintiff's claims. The Court has diversity jurisdiction over these claims as the parties are of diverse citizenship and the amount in controversy exceeds $75,000. After carefully reviewing the record, the Court enters the following order.

### *Factual and Procedural Background*

Plaintiff owns a farm near Monticello, Georgia. In 1980, he built two commercial chicken houses on the farm to produce eggs for commercial egg companies. That same year, Plaintiff began to work with Southern Empire Egg. At the time, the company was owned by Jack Davis. In 1995, Plaintiff built an additional commercial chicken house. Considering the significant cost of building a house large enough to hold twice the number of chickens he had been housing, Plaintiff Wells requested a guarantee from Southern

1

Empire that they would place chickens with him for five years.  Although this was an oral agreement, it was later memorialized in a letter sent by Mr. Davis to the bank that loaned Wells the money to construct the third, larger house.[1]  The letter was dated July 20, 1995 and stated that Southern Empire would agree to keep chickens at Wells' farm for at least five years.    On April 3, 1997, Defendant Cal-Maine bought Southern Empire Egg.  As part of the purchase, Cal-Maine acquired all of Southern Empire's assets including company-owned chicken houses, feed plants, office facilities and several flocks which had been placed on farms owned by independent contract growers.  Plaintiff Wells was one of the independent contract growers.

Cal-Maine is a commercial egg company that produces chicken eggs for sale to the public.  Cal-Maine's egg production needs are met primarily by company-owned facilities and to a lesser degree by independent contract growers, or "Producers" such as Plaintiff Wells.  Producers own the farms and are responsible for providing the labor, water, housing facilities and other equipment necessary for egg production.  The company owns the chickens, retains a right of entry onto the farms for inspection and retrieval of the eggs and furnishes the feed and medical needs of the flock.  Cal-Maine employs flock supervisors to visit the facilities at which its flocks are kept to assess the condition and operation of the facilities.  The flock supervisors are also available to offer assistance to the Producers in the form of suggestions regarding equipment and general operation.

Cal-Maine maintains that its arrangement with Plaintiff was the same as it had with any other independent contract grower, the most important feature of which was that hens

_____

[1]R. at 14, Ex. B.

were placed with the growers on a flock-to-flock basis.  As a flock was nearing expiration, Cal-Maine would assess its market needs, the husbandry practices of the grower and the quality and quantity of the egg production by the grower.[2]  Cal-Maine contends that there was never a guarantee of any placement of new flocks.  Pursuant to the agreements with the growers, Cal-Maine could slaughter its existing flocks if the grower's husbandry practices or physical facilities deteriorated or if the flock became diseased or otherwise unproductive.

A few days after Cal-Maine purchased the farms and other facilities from Southern Empire Egg, Plaintiff's bank, West Georgia Farm Credit, contacted Cal-Maine.  The bank apparently sought clarification regarding the relationship between Plaintiff and Cal-Maine.[3] The response letter from Jerry Straughan, General Manager for Cal-Maine, stated in pertinent part that (1) a certain type of specialty egg was produced on Plaintiff's farm, (2) that Cal-Maine had found the arrangement at Plaintiff's farm to be "very good for meeting" Cal-Maine's needs, (3) that Cal-Maine only contracts for egg production on a flock to flock basis, and (4) that subsequent contracts would depend on Cal-Maine's needs for eggs and the continuation of proper poultry husbandry practices and care of the birds by the producer.[4]

---

[2]B. Scott Dep. at 48.  Mr. Scott testified that Cal-Maine never makes a decision about whether it is going to replace a flock until five months prior to the end of the contract because all of their contracts are flock-to-flock agreements.

[3]Defendant Cal-Maine asserts that this was in connection with an attempt by the Plaintiff to secure additional financing for his farm.  Plaintiff denies having knowledge of the existence of this letter until several years later.  For purposes of this opinion, this dispute is immaterial.

[4]R. at 9, Ex. F.

Plaintiff contends that on or about May 2, 1997, one of Cal-Maine's employees, Bill Bryson, inspected Plaintiff's farm and informed Plaintiff that he needed a new feeding system.  Bryson was hired to fill in on a part-time basis at Cal-Maine's recently acquired Shady Dale facility to assist in the operation of the company-owned farms.  Occasionally, Bryson would accompany Thomas Bryant on trips to inspect the contract farms.  These inspectors reported back to Cal-Maine regarding the condition of the farms and the general management of the farm.  When Plaintiff Wells and Bryson spoke about the need for a new feeding system, the following conversation took place:

> I told him that the feeders cost a whole lot of money.  At the time, I didn't know what they cost.  I told him in order to put new feeders in here, I'd have to have a guarantee from ya'll for at least ten years to pay for the feeders, to put them in there.  Bill said, well, we'll go and see if we can find some used feeders; we can put them in there if we could find them.  I said, well, yeah, they'd be a lot cheaper.  So, he [had another individual look for used feeders].  He couldn't find any used feeders. . . .  Got back with Bill and I discussed it with him and I told him I'd see about getting new feeders but I got to have ten years and me and him shook on it.[5]

In March of 1998, Plaintiff Wells obtained financing for and installed a new feeding system.

On July 18, 2000, Plaintiff Wells and Cal-Maine entered into what was apparently their first written contract for the production of eggs on Plaintiff's farm, the pertinent terms being:

- the parties agreed that the Producer, Plaintiff Wells, would receive and care for commercial production type chickens, pullets and hens and produce eggs for the Company, Defendant Cal-Maine;

- the poultry would remain the property of the Company;

---

[5]Plf.'s Dep. at 30-31.

4

- the agreement covered the economic life of one flock consisting of approximately 100,000 birds to be housed in the Producer's facility;

- the Company had no obligation to replace the flock with any replacement flock;

- the Producer agreed to receive, grow and properly care for the flock and to provide all labor, equipment, water, utilities and refrigerated facilities;

- the Producer agreed to maintain his facilities in such a manner that the driveways and loading docks will be adequate and sufficient to receive vehicles necessary to service the flocks and to pick up and receive the eggs;

- the Producer agreed to maintain pest control to the highest practical level;

- the Producer agreed to clean his facilities and to comply with all applicable laws and regulations;

- the Company agreed to deliver the necessary food and to supply the necessary filler flats, cases, dollies or pallets necessary for the packing of the eggs for transport;

- the Company would supply heaters and fuel during the molt periods;

- the Producer agreed to keep an accurate daily record of bird mortality, ambient chicken house temperatures, egg cooler temperatures, level of egg production, sample bird weights and water consumption;

- title to all birds, feed, eggs, supplies and material remained the property of the Company;

- the Producer would perform his obligations as an independent contractor and agreed to indemnify, defend and hold the Company harmless from and

5

against any and all claims, losses, damages or liability of any nature, for injuries to persons or damage to property or for violation of any law which arose out of or resulted from the Producer's acts or omissions in the discharge of his obligations under the contract;

- the Company could terminate the contract at any time if, in the judgment of the Company, the Producer failed to properly care for and maintain the birds, feed or other property of the Company, at which time the Company would take possession of the poultry, eggs or any other Company property located on the Producer's premises;

- in the event of a breach of any of the contractual terms the Producer forfeited any and all claims for labor, use of equipment and supplies and waived the right to payment to any sum then due and owing;

- the Company would exert its best efforts to deliver flocks of hens suitable for commercial egg production but expressly disclaimed any warranty, express or implied, as to the condition of or as to the potential performance or quality of the poultry delivered to the Producer;

- the contract shall be construed by and in accordance with the laws of Mississippi; and

- a merger clause stated that the contract represented the entire agreement between the parties, that no covenants, warranties, conditions or representations would be binding on the parties unless expressly set out therein and that the contract superseded all prior agreements and understandings, oral or written.

6

In August of 2000, after Cal-Maine received several reports[6] that Plaintiff's management of the farm was not meeting Cal-Maine's standards, one of Cal-Maine's employees, Danny Beckham, informed Plaintiff that Cal-Maine planned to stop placing chickens in Plaintiff's two older houses.  In May of 2001, Cal-Maine slaughtered the flock that had been in the two older houses.  In September of 2001, Cal-Maine sold the remaining flock to another farm owned by Jack Davis.  On September 28, 2001, the July 2000 contract was terminated based on Cal-Maine's determination that it no longer desired to utilize the services of Plaintiff Wells for the production of eggs.  The Termination Agreement contained the following pertinent terms:

- neither party shall have any further right, duty nor obligation in relation to the previous contract;

- Wells acknowledged that Cal-Maine had paid all sums presently due and owing to Wells with one exception that was scheduled for later payment;

- Wells acknowledged that he has no claims against Cal-Maine relative to the performance by Wells of his obligations;

- In consideration of the MUTUAL RELEASE of each party, Wells released, discharged and agreed to hold Cal-Maine harmless from and against any loss, cost, damage or liability which may result or arise from the execution, existence, performance or discharge of the contract;

- In consideration of the MUTUAL RELEASE of each party, Cal-Maine

---

[6]These problems are detailed in Danny Beckhams' deposition but are, generally, problems with the cleanliness of the facilities, the feeder system not distributing feed evenly to the hens which caused large amounts of feed to spill onto the floor, the failure to repair and maintain the facilities in accordance with Cal-Maine's standards and the failure to pick up the eggs on a regular schedule.

released, discharged and agreed to hold Wells harmless from and against any loss, cost, damage or liability which may result or arise from the execution, existence, performance or discharge of the contract;

•   Wells acknowledged that Cal-Maine had no obligation to place any additional flocks in the facilities owned by Wells.

Although Plaintiff continues to produce eggs for Jack Davis out of the house built in 1995, Plaintiff has been unable to obtain a contract on his two older houses.  Plaintiff claims that as a result of Cal-Maine terminating its contract with him, he lost his $138,000 investment in the new feeding equipment, the other investments in the houses and income in excess of $200,000.  Based on the facts set forth above, Plaintiff claims breach of contract, fraud and negligent representation.

### Plaintiff's Claims

#### Breach of Contract

Plaintiff asserted three breach of contract claims.  Plaintiff claims that Cal-Maine breached an agreement between the parties by providing poor quality and sick hens on one occasion in 1998.  Plaintiff contends that a 1995 letter establishes the existence of a contract between the parties to place hens with Plaintiff for a certain period of time.  Plaintiff also claims that Cal-Maine breached an oral contract to place hens in Plaintiff's facilities for ten years.

Plaintiff's allegation that Cal-Maine provided poor quality hens in 1998 has no merit.  Defendant argued in its motion for summary judgment that, among other things, this claim is barred as outside the applicable four-year statute of limitations for oral contracts.  See O.C.G.A. § 9-3-25.  In his response, Plaintiff failed to address this argument or to present

8

any argument supporting this particular claim.  Because the claim is outside the four-year statute of limitations for oral contracts and has been abandoned by the Plaintiff, Defendant is entitled to summary judgment on this claim.

Plaintiff claims that the July 20, 1995 letter from Southern Empire Egg to Plaintiff evidences an agreement to place chickens with Plaintiff for five years and that Cal-Maine violated that agreement by terminating Plaintiff's contract.  First, this written "agreement" was superseded by the July 2000 and September 2001 contracts, as more fully explained below.  Second, any claim based on this contract would be barred by the applicable six-year statute of limitations for written contracts.  See O.C.G.A. § 9-3-24.  The "contract," assuming the letter met the requirements for a contract, was formed in July of 1995.  This case was filed March 23, 2004, almost nine years later.  Finally, Plaintiff did in fact have chickens on his farm from Southern Empire and Cal-Maine for five years after the letter was written.

The primary breach of contract claim is based on an alleged oral agreement that Cal-Maine would place hens with Plaintiff for ten years.  Plaintiff's claim is based on a conversation between Plaintiff and Bill Bryson wherein Plaintiff stated that he would not update his feeding equipment unless Cal-Maine promised to supply him with hens for ten years.  Because this was, if anything, an oral contract that could not have been performed within one year, it is within the Statute of Frauds.  See O.C.G.A. § 13-5-30(5).  See also Trebor Corp. v. Nutmet Indus., Inc., 431 S.E.2d 402 (Ga. App. 1993)(oral contract for a permanent distributorship not enforceable because Statute of Frauds requires such contracts to be in writing); Peacock v. Chegwidden, 518 S.E.2d 760, 764 (Ga. App. 1999)(contract not formed in face of "incomplete negotiations without a meeting of the

9

minds as to all essential terms").

One of the exceptions to the Statute of Frauds is where there is part performance by the promisee regarding a particular act required by the alleged contract. Plaintiff Wells contends that his expenditure of money for and his updating the feeding equipment was part performance of the alleged oral contract that brings this contract outside the Statute of Frauds.

"[T]he proponent of part performance must first establish that the contract is certain and definite in all essential particulars." Peacock, 518 S.E.2d at 764. Even Plaintiff's version of the alleged conversation between him and Bill Bryson fails the "certainty" and "definiteness" requirements. During that particular visit to Plaintiff's farm, Bryson pointed out that Plaintiff's feeding equipment needed to be replaced. Plaintiff alleges that he told Bryson "feeders cost a whole lot of money," that Plaintiff would "have to have a guarantee from [Cal-Maine] for at least ten years to pay for the feeders, to put them in there" and that Bryson's said "we'll go and see if we can find some used feeders; we can put them in there if we could find them."[7] Even taken as a whole, these statements do not amount to an oral contract because the essential terms are not certain or definite. There is no evidence of an agreement, at that time, regarding the number of hens to be placed on Plaintiff's farm, the price for the eggs produced, the schedule by which hens would be replaced or the precise equipment that would be required. Further, Plaintiff's act of updating his feeding equipment was nothing beyond what would have been required by any other Contract Producer to ensure placement of hens on a continual basis. See Golden v. Nat'l Service

---

[7]Plf.'s Dep. at 30-32.

Indus., 435 S.E.2d 270, 271 (Ga. App. 1993)(Conduct by an employee who began employment, moved to another city and refused another offer was merely preparatory or preliminary to the performance of a contract terminable at will and did not verify the existence of a contract because he did nothing that would not have been required by any employee who took the job).  The record is clear that Cal-Maine imposed on its Contract Producers very strict standards for maintaining the hen houses.  Any part performance must be "consistent with the presence of a contract and inconsistent with the lack of a contract."  Stedry v. Summit Nat. Bank, 489 S.E.2d 862 (Ga. App. 1997)(citing Katz v. Custom Spray Products, 309 S.E.2d 663 (Ga. App. 1983)).  Updating the feeding equipment was just as consistent with the absence of a contract (procuring new equipment in the hopes of obtaining a new contract) as it would have been with the presence of a new, verbal contract (procuring new equipment in accordance with a new contract's terms). Plaintiff's claim of part performance therefore fails.

The alleged agreement between the parties fails to satisfy the requirement of an enforceable contract for another reason.  "It is well settled that contracts conditioned upon discretionary contingencies lack mutuality."  Stone Mountain Properties, Ltd. v. Helmer, 229 S.E.2d 779, 782 (Ga. App. 1976).  Where a contract may be terminated by one of the parties should it become dissatisfied with another's management and operation of the thing in issue, the contract lacks mutuality.  Id.  In Stone Mountain Properties, a purchaser of real estate on which the purchaser hoped to build a rail line conditioned his purchase on procuring a location satisfactory to him.  The court found this condition deprived the purported contract of mutuality because the purchaser was the sole judge of his satisfaction regardless of whether there were reasonable and sufficient grounds for such

11

dissatisfaction. Id. at 783. "Where the fancy, taste, sensibility, or judgment of the promisor is involved, there is practical unanimity that if one agrees to accept and pay if he is satisfied with a thing, he cannot be compelled to do so on proof that other people are satisfied with it, or that he ought to be." Id.  The court further held that "where the company reserved to itself the question of satisfaction, it would be changing the contract to hold that what would satisfy a reasonable man would answer the terms of the contract." Id.  Finally, "The test of mutuality is to be applied, not as of the time when the promises are made, but as of the time when one or the other is sought to be enforced." Id. at 784.

In the case at bar, the alleged oral contract was conditioned upon discretionary contingencies of Cal-Maine's satisfaction.  Any purported contract could be terminated by Cal-Maine if at any time it became dissatisfied with Plaintiff Wells' management and operation of the farm.  Cal-Maine was the sole judge of its satisfaction regardless of whether there were reasonable and sufficient grounds for such dissatisfaction.  Since Cal-Maine's fancy, taste, sensibility or judgment of Plaintiff's services and performance was involved, Cal-Maine cannot be compelled to accept Plaintiff's management of the farm on proof that other people were satisfied with it, or that Cal-Maine ought to be.  Cal-Maine reserved to itself the question of satisfaction and it would be changing the contract to hold that what would satisfy a reasonable man would answer the terms of the purported contract.  Finally, the test of mutuality is to be applied, not as of the time when the promises were allegedly made, but as of the time when Plaintiff sought to enforce the contract, at the time of the filing of the suit.  There is no evidence that Cal-Maine was ever satisfied with Plaintiff Wells' management of the farm as shown by the decision to remove the hens from the Wells farm and the reports of numerous violations of Cal-Maine's strict

operational standards.

Finally, the two written contracts entered into by Plaintiff Wells and Cal-Maine in July of 2000 and September of 2001 served as, respectively, novations of any preexisting agreements between Plaintiff and Cal-Maine and a termination of the previous contracts. As there is nothing in the record indicating any circumstances that would void the contracts, such as fraud or duress in the formation of the contracts, the Court will construe the contracts as written pursuant to applicable law.

The July 2000 contract provided that it was to be construed pursuant to the laws of Mississippi. Under Mississippi law, there are three kinds of novation, one of which exists where the parties to a contract remain the same, but a new obligation is substituted for the old. See Ainsworth v. Lee, 67 So.2d 905, 907 (Miss. 1953). Moreover, "a written contract cannot be varied by prior oral agreements." Godfrey, Bassett & Kuykendall Architects, Ltd. v. Huntington Lumber & Supply, 584 So.2d 1254, 1257 (Miss. 1991) (citing Fortune Furniture Mfg. Inc. v. Pates' Elec. Co., 356 So.2d 1176 (Miss. 1978); Commercial Credit Corp. v. Long, 82 So.2d 847 (Miss. 1955)). With the July 2000 contract, the parties remained the same but new obligations were substituted for, and superceded, the former obligations. The July 2000 contract therefore properly replaced any prior oral or written agreements.[8]

---

[8]In Georgia, the four necessary elements of a novation are (1) a previous valid obligation, (2) the agreement of all the parties to the new contract, (3) the extinguishment of the old contract and (4) the validity of the new one. Fassero v. Weinstock & Scavo, P.C., 583 S.E.2d 485, 486 (Ga. App. 2003). These elements are met in this case by, respectively, (1) the previous agreements pursuant to which Plaintiff and Cal-Maine had operated, (2) the parties' signatures on the written contract, (3) the language in the written contract that evidenced an intent to supercede all previous agreements and (4) the presumed validity of the previous agreements.

13

Unlike the July 2000 contract, there was no clause in the September 2001 Termination Agreement indicating it was to be construed pursuant to Mississippi law.  The Court will therefore construe and apply the terms of the contract pursuant to Georgia law as the contract was entered into in Georgia with a resident of Georgia and the subject matter of the contract concerns activities that took place in Georgia.

The 2001 Termination Agreement contains all of the essential terms of a valid contract: parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract and a subject matter upon which the contract can operate.  See O.C.G.A. § 13-3-1.  Plaintiff Wells and Cal-Maine are clearly parties who were able to contract.  The consideration of the 2001 contract was the mutual release of claims and obligations by and between the parties.  The signatures of the parties evidence their assent to the terms therein.  Finally, the subject matter of the contract was clear - the termination of the parties' business relationship.

Contrary to Plaintiff's assertions, there is no evidence that the contracts referred only to the production of eggs in the third, newer house.  Both contracts refer to the Plaintiff's "facilities" in general, clearly indicating the application of the contracts to any and all facilities owned by Plaintiff and to any and all egg production by Plaintiff.  Both written agreements clearly set forth that any and all prior agreements, oral or written, between the parties were superceded, the last of which extinguished the relationship entirely and any responsibility one party had toward the other.  Defendant Cal-Maine is therefore entitled to summary judgment on all of Plaintiff's breach of contract claims.

### *Fraud and Negligent Representation*

Plaintiff claimed that Defendant made fraudulent statements that induced him into purchasing the $138,000 feeding equipment.  There are five elements of fraud under Georgia law:  (1) a false representation of a past or present fact; (2) an intent to deceive or defraud; (3) intention to induce the plaintiff to commit an act or refrain from committing an act; (4) reliance; and (5) damage.  DeLong Equipment Co. v. Washington Mills Abrasive Co., 887 F.2d 1499, 1519 (11th Cir. 1989)(citing O.C.G.A. § 51-6-1; Parsells v. Orkin Exterminating Co., 322 S.E.2d 91 (Ga. App. 1984)).  However, "a fraud plaintiff must have used due diligence in attempting to establish the truth or falsity of a defendant's assertions."  Id.  "One cannot claim to be defrauded about a matter equally open to the observation of all parties where no special relation of trust or confidence exists.  Further, in the absence of special circumstances one must exercise ordinary diligence in making an independent verification of contractual terms and representations, failure to do which will bar an action based on fraud.  Moran v. NAV Services, 377 S.E.2d 909, 910 (Ga. App. 1989).  Promises that refer only to future events are not actionable.  DeLong, 887 F.2d at 1510 (citing Lanham v. Mr. B's Oil Co., 304 S.E.2d 738, 739 (Ga. App. 1983)).  There is one exception to this rule regarding promises of future events made with the present intention not to perform but this exception does not apply to terminable, employment-at-will contracts.  Lanham, 304 S.E.2d at 739.

Plaintiff Wells has not established a fraud claim.  He could have easily verified with Cal-Maine whether Bill Bryson could in fact obligate the company for ten years and whether Cal-Maine intended to give Plaintiff a ten-year agreement.  There is no evidence of a special relationship between the parties such that Plaintiff was not obligated to follow

15

up with Cal-Maine regarding the existence of the alleged agreement.  Further, Plaintiff points to no evidence to support his claim of Cal-Maine's then-present intention to not place hens with Plaintiff for any period of time.  Based on the foregoing, the fraud claim has no merit and Defendant Cal-Maine is  entitled to summary judgment on that claim.

### Negligent Representation/Misrepresentation

"One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." Gilmour v. American Nat. Red Cross, 385 F.3d 1318, 1323 (11th Cir. 2004)(citing Robert & Co. Assocs. v. Rhodes-Haverty P'ship., 300 S.E.2d 503 (Ga. 1983); Restatement (Second) of Torts, § 552 (1977)).  "To state a claim for negligent misrepresentation under Georgia law the speaker must have a pecuniary interest" in the matter promised.  Id. (citation omitted). "This reading avoids imposing liability on a speaker who provides gratuitous information when the speaker is not obligated to speak."  Id.

Bill Bryson had no pecuniary interest in whether Plaintiff received or Cal-Maine placed hens in Plaintiff's houses for 10 years.  He was simply one of the individuals who visited the various farms to ensure that the Producers were performing up to Cal-Maine's standards.  Even assuming Bryson, or anyone else associated with Cal-Maine who visited Plaintiff, had a pecuniary interest in the placement of hens with Plaintiff, the finding that Plaintiff's reliance on any such statements was unreasonable as a matter of law forecloses a claim based on negligent representation.  Gilmour, 385 F.2d at 1324.

16

### Defendant's Counterclaim

Cal-Maine contends it is entitled to costs and attorney's pursuant to Paragraph 5 of the Termination Agreement which reads:

> In consideration of the mutual release of each party hereto by the other, WELLS does hereby release, discharge and agree to hold CAL-MAINE, its agents, servants, employees and directors harmless from and against any loss, costs, damage or liability which may result of arise from the execution, existence, performance or discharge of the Agreement.

As explained above, the Termination Agreement will be construed pursuant to Georgia law. In Georgia, "The expenses of litigation generally shall not be allowed as a part of the damages. . . . These damages are available to a defendant only where the defendant has brought a counterclaim asserting a claim for relief wholly independent of any assertion as to plaintiff's bad faith, litigiousness, and/or harassment in bringing the underlying action." Steele v. Russell, 424 S.E.2d 272, 273 (Ga. 1993)(citation omitted); O.C.G.A. § 13-6-11; Gilmour, 385 F.2d at 1324 (a claim for attorney's fees under O.C.G.A. § 13-6-11 requires an underlying claim). Attorney's fees are also available in Georgia pursuant to O.C.G.A. § 9-15-14 when a party brings or defends action lacking substantial justification. "However, a claim brought pursuant to O.C.G.A. § 9-15-14 can only be asserted in Georgia state or superior courts." Munson v. Strategis Asset Valuation and Mgmt., --- F.Supp.2d ----, 2005 WL 752778, *n.1 (N.D. Ga. 2005) (citing Edwards v. Associated Bureaus, Inc., 128 F.R.D. 682, 683 (N.D. Ga.1989)).[9]

---

[9]Even under Mississippi law, Defendant's claim for attorney's fees fails. In a breach of contract action brought pursuant to Mississippi law, attorney's fees are "not awarded absent provision for such in the contract or a finding of conduct so outrageous as to support an award of punitive damages." See Sports Page Inc. v. Punzo, --- So.2d ----, 2004 WL 2663151, *8 (Miss. App. 2004). There was no specific provision in the contract regarding attorney's fees and there has been no showing of such outrageous conduct by Defendant to support an award of punitive damages. Further, pursuant to Mississippi Code Annotated § 11-55-5 (Rev.2002), a party may be awarded attorney's fees where a claim or defense has

Defendant did not state which statute it contends supports its counterclaim for attorney's fees and costs.  However, Defendant may only pursue a claim for attorney's fees in this Court based on O.C.G.A. § 13-6-11 which provides for fees when a defendant files a counterclaim independent of any assertion as to a plaintiff's bad faith, litigiousness, and/or harassment in bringing the underlying action.  Because Defendant Cal-Maine did not assert an underlying claim as a basis for attorney's fees, and did not argue the same in its motion for summary judgment, the Counterclaim is DISMISSED.

***Conclusion***

For the reasons set forth above, Defendant's motion for summary judgment is GRANTED, Defendant's Counterclaim is DISMISSED and judgment shall be entered accordingly which each party to bear its own attorney's fees.

**SO ORDERED this 12th day of May, 2005.**

_____
**WILBUR D. OWENS, JR.**
**UNITED STATES DISTRICT JUDGE**

---

been asserted "that is without substantial justification, or that the action, or any claim or defense asserted, was interposed for delay or harassment, or if it finds that an attorney or party unnecessarily expanded the proceedings by other improper conduct including, but not limited to, abuse of discovery procedures available under the Mississippi Rules of Civil Procedure."  However, this statute may only be invoked in cases brought in a state court in Mississippi.